[Cite as *In re M.M.*, 2018-Ohio-2034.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERYCOUNTY**

| | |
|---|---|
| IN RE: M.M. | : |
| | : |
| | :    C.A. CASE NOS. 27722 and 27724 |
| | : |
| | :    T.C. NOS. JC-2015-6384 and |
| | :              2016-3599 |
| | : |
| | :    (Civil Appeal from Juvenile Court) |
| | : |
| | : |
| | : |

. . . . . . . . . . .

# **O P I N I O N**

Rendered on the 25th day of May, 2018.

. . . . . . . . . . .

ALICE PETERS, Atty. Reg. No. 0093945, Montgomery County Prosecutor's Office, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee – Montgomery County Children Services Board

ROBERT BRENNER, Atty. Reg. No. 0067714, P.O. Box 340214, Beavercreek, Ohio 45434
     Attorney for Defendant-Appellant - Father

MICHAEL BOOHER, Atty. Reg. No. 0007694, 120 West Second Street, Suite 1504, Dayton, Ohio 45402
     Attorney for Minor Child

CHRISTOPHER DEAL, Atty. Reg. No. 0078510, Law Offices of Gump & Deal, 2541

Shiloh Springs Road, Dayton, Ohio 45426
        Attorney for Maternal Grandfather


THEODORE VALLEY, Atty. Reg. No. 0070867, Baldwin Valley Law, LLC, 854 East Franklin Street, Dayton, Ohio 45459
        Attorney for Guardian Ad Litem

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Petitioner-appellant Father appeals a decision of the Montgomery County Court of Common Pleas, Juvenile Division, overruling his objections to the Magistrate's decision, finding M.M. to be a dependent child, granting temporary custody of M.M. to the maternal aunt, and postponing Father's visitation with M.M. until her therapist recommends it.  Father filed a timely notice of appeal with this Court on September 8, 2017.

{¶ 2} M.M. was born to Mother and Father in March of 2002.   Mother and Father divorced in December of 2009.   After the divorce, Mother became M.M.'s primary custodian, and Father was awarded standard visitation.   As M.M. grew older, she would often refuse to go to Father's house when it became his time to exercise visitation.  During February of 2015, M.M. alleged that Father had sexually abused her.   Law enforcement in Clermont County, Ohio, investigated the allegations made by M.M. but ultimately did not file charges against Father.   In July of 2015, Mother sent M.M. to live with the maternal grandfather, J.W., because of conflict between Mother's boyfriend and M.M.

{¶ 3} On October 6, 2015, Mother passed away as a result of suicide.   During this time M.M. continued to reside with the maternal grandfather.   We note that at the time of

the temporary custody hearing, Father had not seen M.M. since May of 2014, and had not spoken with her since April of 2015.   On October 20, 2015, the maternal grandfather filed a petition for custody of M.M. in Case No. JC 2015-6384.   On December 4, 2015, Father filed a motion to dismiss the maternal grandfather's petition for custody for lack of jurisdiction.   The juvenile magistrate overruled Father's motion to dismiss on February 2, 2016.   Thereafter on March 21, 2016, Father filed a motion for a psychological and physical examination of M.M. which the magistrate later granted on May 4, 2016.

{¶ 4} On June 1, 2016, Montgomery County Children's Services (MCCS) filed a complaint in Case No. JC 2016-3599 alleging that M.M. was a dependent child and requesting a disposition of temporary custody to the maternal grandfather, or, in the alternative, temporary custody to MCCS.   On June 13, 2016, an interim order hearing was held before the magistrate who granted interim temporary custody of M.M. to MCCS.   On June 20, 2016, the juvenile court consolidated Case Nos. JC 2015-6384 and JC 2016-3599.   On July 21, 2016, the Court Appointed Special Advocate (CASA)/ Guardian ad Litem (GAL) filed a motion requesting temporary custody of M.M. be granted to MCCS.   On July 26, 2016, MCCS filed an amended complaint requesting an alternative disposition of temporary custody of M.M. to the maternal aunt, L.B.   On August 4, 2016, the GAL filed an amended motion requesting temporary custody of M.M. to MCCS, or, in the alternative, temporary custody to the maternal aunt.

{¶ 5} On August 11, 2016, a temporary custody hearing was held before the magistrate.   On August 12, 2016, the magistrate issued a decision finding M.M. to be a dependent child and awarded temporary custody of the child to the maternal aunt.   The magistrate also ordered that Father was not to have visitation with M.M. until her therapist

recommended it.   At the time of the hearing, M.M. had been removed from the maternal grandfather's home by MCCS and was living with a foster family.

{¶ 6} Father filed objections to the magistrate's decision on August 25, 2016. After receiving the transcript of the temporary custody hearing, Father filed supplemental objections on March 28, 2017.   MCCS filed its reply to Father's supplemental objections on April 27, 2017.   Thereafter, on August 9, 2017, the juvenile court issued a decision overruling Father's objections and adopting the magistrate's decision adjudicating M.M. as a dependent child and granting temporary custody to the maternal aunt.   The juvenile court also granted a first extension of temporary custody to the maternal aunt since the original award of temporary custody had expired on June 2, 2017.

{¶ 7} It is from this decision that Father now appeals.

{¶ 8} Father's first assignment of error is as follows:

{¶ 9} "THE TRIAL COURT ERRED BY FINDING M.M. TO BE A DEPENDENT CHILD."

{¶ 10} In his first assignment, Father contends that the juvenile court erred when it adjudicated M.M. as a dependent child because he has affirmatively expressed his desire to raise his daughter and is able to provide adequate parental care and support for her.

{¶ 11} A "dependent child" includes one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship * * *." R.C. 2151.04(C).   A trial court's dependency finding must be supported by clear and convincing evidence. *In re P. G.*, 2d Dist. Montgomery No. 22706, 2008–Ohio–4015, ¶ 11.   This Court's review is limited to determining whether the record contains sufficient,

credible evidence to support the trial court's decision. *Id.*

{¶ 12} The focus in a dependency proceeding is on the child's condition, not on parental fault or a lack thereof. *In re A.W.*, 2d Dist. Montgomery No. 25039, 2012-Ohio-2657, ¶ 11; *see also In re Riddle*, 79 Ohio St.3d 259, 263, 680 N.E.2d 1227 (1997) (recognizing that a dependency case focuses on the condition or environment of the child rather than parental fault); *State v. Frazier*, 2d Dist. Montgomery Nos. 15273, 15274, 1996 WL 517271, *3 (Sept. 13, 1996) ("Unlike a case involving neglect, fault on the part of a parent is not necessary to a finding of dependency. * * * *In dependency cases, the focus is on the condition of the children*, and not the fault of the parents."). "This is not to say that a parent's conduct is never relevant in a dependency proceeding. A parent's problems and deficiencies certainly can affect a child's condition or environment and necessitate state intervention." *In re A.W.* at ¶ 11, citing *In re Lannom*, 2d Dist. Clark No. 96–CA–64, 1997 WL 761323, *5 (Dec. 12, 1997). "But a finding of dependency does not require a showing of parental fault because fault is not an issue in a dependency proceeding." *In re A.W.* at ¶ 11.

{¶ 13} "The conduct of a parent is relevant under [R.C. 2151.04(C)] solely insofar as that parent's conduct forms a part of the environment of the child. As a part of the child's environment such conduct is only significant if it can be demonstrated to have an adverse impact upon the child sufficiently to warrant state intervention. That impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner." *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979).

{¶ 14} M.M. was adjudicated as a dependent child pursuant to R.C. 2151.04(A) and (C). R.C. 2151.04(A) defines "dependent child" as any child "[w]ho is homeless or

destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian."  R.C. 2151.04(C) defines "dependent child" as any child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship."

{¶ 15} As previously stated, Mother passed away as a result of suicide on October 6, 2015.  Prior to her death, Mother arranged for M.M. to live with the maternal grandfather beginning in July of 2015.  The maternal grandfather testified that he struggled to control M.M.'s behaviors and was unable to set rules and boundaries for her. Dr. Elana Harris, a child psychiatrist at Cincinnati Children's Hospital, testified that she had been treating M.M. since September of 2015.   Dr. Harris diagnosed M.M. with post-traumatic stress disorder (PTSD), generalized anxiety disorder, major depression, obsessive compulsive disorder (OCD), and Tourette's Syndrome.  Dr. Harris testified that M.M. suffered from nightmares, intrusive thoughts and memories, flashbacks, difficulty concentrating, suicidal ideation, and anxiety.   M.M. also suffered from significant medical issues, including severe headaches, insomnia, and abdominal issues, for which she was receiving treatment.

{¶ 16} Dr. Harris testified that M.M.'s PTSD was caused by a number of traumas that she had suffered throughout her life.   Dr. Harris testified that M.M. recounted memories of domestic violence perpetrated by Father against Mother which occurred when she was approximately six years old.   M.M. also told Dr. Harris that she had been sexually molested by Father when she was a child.   Dr. Harris testified that triggers for M.M.'s PTSD include Father, talking about Father, himself, and thinking about living with Father.   Dr. Harris testified that she believed that M.M.'s perspectives about her Father

were her own and that she was not malingering or being influenced by her Mother's family against Father. Dr. Harris concluded that visits with Father would be detrimental to M.M.'s progress in treatment, and therefore, not in her best medical and mental health interest.

{¶ 17} Dr. Antoinette Cordell, a clinical and developmental psychologist independently hired by Father, performed a psychological evaluation of M.M. in June of 2016. Essentially echoing the findings made by Dr. Harris, Dr. Cordell testified that M.M. suffered from PTSD as a result of the traumas she had suffered. Dr. Cordell testified that M.M. indicated that "she was sexually, physically, and mentally abused, in her mind, by her biological father." Trans. 127-128. Dr. Cordell further testified that M.M. did not appear to have been influenced against Father, nor did her statements seem coached. Dr. Cordell testified that M.M.'s mental and physical issues were real and that she was not malingering. Dr. Cordell testified that she did not recommend visitation with Father because M.M. was not currently stable enough, and visitation would be detrimental to her treatment.

{¶ 18} Melody Popp, M.M.'s caseworker at MCCS, testified that M.M. was adamant that she did not want to have any contact with her Father. During a home visit in May of 2016, Popp attempted to discuss the subject of visiting Father with M.M. Popp testified that M.M. immediately became very upset, was shaking, and started hyperventilating. M.M. informed Popp that "she did not want to live anywhere if she was forced to live with her father." Trans. 56. We note that Dr. Harris testified that during a therapeutic session, M.M. stated that she "would not want to be alive if she were returned to her father." Trans. 25.

**{¶ 19}** In contrast to the diagnoses of Drs. Harris and Cordell, Father testified that he believed that M.M. was malingering and falsely reporting medical problems. Father testified that M.M. was manipulating all of the adults in her life, including Drs. Harris and Cordell. Father testified that everyone permitted M.M. to make decisions for herself, and he was the only adult willing to make decisions on her behalf and not be manipulated by her. Despite Dr. Harris and Popp's testimony with respect to M.M.'s threatening suicide if she returned to live with Father, he testified that she would not be in any physical harm if she came to live with him. Popp testified that Father stated religion was very important to him and that MCCS should force M.M. to go to church on the weekends. Popp further testified that Father stated that if she refused to go, MCCS should call the police to come and force her to attend church. Dr. Cordell testified that forcing religious participation on M.M. would be detrimental to her mental and physical health.

**{¶ 20}** Upon review, we conclude that clear and convincing evidence was adduced at the temporary custody hearing which established that M.M. is a dependent child pursuant to R.C. 2151.04(A) and (C). The record establishes that the maternal grandfather was unable to properly care for M.M. because of her special mental and physical needs. Furthermore, both Dr. Harris and Dr. Cordell testified that based upon their treatment of M.M., it would be detrimental for her to have visitation with Father, let alone custody, and therefore, not in her best interests. Given M.M.'s existing mental and physical problems, as well as her perception of Father, placement of M.M. in his home would further exacerbate her existing issues. Accordingly, the trial court did not err when it adopted the magistrate's decision adjudicating M.M. a dependent child.

**{¶ 21}** Father's first assignment of error is overruled.

{¶ 22} Father's second assignment of error is as follows:

{¶ 23} "THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING A FIRST EXTENSION OF TEMPORARY CUSTODY OF M.M TO HER MATERNAL AUNT."

{¶ 24} In his second assignment or error, Father argues that the trial court abused its discretion when it awarded temporary custody of M.M. to the maternal aunt. Specifically, Father argues that the juvenile court relied too heavily on the testimony of Dr. Harris and Dr. Cordell, whom he alleges have been manipulated by M.M. Father further argues that the evidence established that he was able to properly care for M.M. and address her mental health issues.

{¶ 25} A court may commit a dependent child to the temporary custody of a public children services agency or a relative residing within or outside the state if the court finds that this disposition is in the child's best interest. *See In re A.W.*, 2d Dist. Montgomery No. 25039, 2012–Ohio–2657, ¶ 17, citing R.C. 2151.353(A)(2) and *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011–Ohio–6710, ¶ 3. The court's temporary custody decision "must be supported by a preponderance of the evidence." *In re S.M.* at ¶ 4. The decision will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence supporting the decision. *See In re A.U.*, 2d Dist. Montgomery No. 22264, 2008–Ohio–186, ¶ 15.

{¶ 26} "While an award of temporary custody to a children-services agency must be supported by the preponderance of the evidence, 'a court has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interest.' " *In re A.W.* at ¶ 17, quoting *In re S.M.* at ¶ 4. A court determines a child's best interest using the relevant factors in R.C. 3109.04(F)(1). *In re D.S.*, 2d Dist. Clark No.

2013 CA 51, 2014–Ohio–2444, ¶ 9.  The factors pertinent to the instant case include: 1) the parents' wishes; 2) the child's wishes, if the court has interviewed the child; 3) the child's interaction with parents, siblings, and others who may significantly affect the child's best interests; 4) adjustment of the child to home, school, and community; and 5) the mental and physical health of all those involved.

{¶ 27} Initially, we note that before Mother passed away, she arranged to have M.M. live with the maternal grandfather and executed a power of attorney for him to care for her.  Popp testified that Mother stated that she wanted M.M. to live with the maternal grandfather.

{¶ 28} Father testified that he wanted custody of M.M. and was able to care for her.  At the time of the hearing, Father had not spoken with M.M. since April of 2015, when he sent her a text message on her birthday.  Father, however, did testify that he wanted the opportunity to rebuild his relationship with M.M.  Father also testified that if he did not get custody of M.M., he still wanted to have visitation with her and would be willing to engage in therapy with her.

{¶ 29} Pursuant to R.C. 2151.353(A)(2), if a child is adjudicated a dependent child, the court may place him or her with a relative residing within or outside the state.    Prior to awarding temporary custody to the maternal aunt, the magistrate held an in camera interview with M.M., and the interview is not part of the record.  While the magistrate's decision does not disclose what was said during the interview, the record establishes that M.M. has consistently stated that she does not want to live with Father nor have any contact with him.  Popp, Dr. Harris, and Dr. Cordell all testified that M.M. became very upset at the suggestion that Father might get custody of her.   As previously stated, M.M.

threatened self-harm when she was asked about living with Father. M.M. told Dr. Harris and Dr. Cordell that she wanted to live with the maternal aunt and was very comfortable with her. In her report, the GAL stated that M.M. clearly expressed her desire to be permanently placed with the maternal grandfather, but if that were not possible, she wanted to be placed in the temporary custody of the maternal aunt.

{¶ 30} The record establishes that M.M. has a very positive relationship with the maternal aunt. Prior to the temporary custody hearing, M.M. spent two weekends staying with the maternal aunt at her residence. M.M. advised Dr. Harris that she did not want to go back to foster care after staying with the maternal aunt. Based upon their favorable interaction, Dr. Harris testified that she believed placement with the maternal aunt would be in M.M.'s best interests. Popp testified that the maternal aunt had the ability to calm M.M. down when she got upset and was also able to help her cope with stressful situations. The maternal aunt testified that she would be able to provide a stable home environment for M.M. as well as manage all of M.M.'s mental health needs.

{¶ 31} Furthermore, although M.M. had been designated as an emotionally disturbed child in a recent Individualized Education Program (IEP), Dr. Cordell testified that the local school district would provide the support necessary for M.M. to successfully transition back into a regular school environment. The maternal aunt testified that she was aware that school was back in session soon and that she was prepared to ensure that all of M.M.'s special educational needs were met at the new school. Dr. Harris testified that M.M. was very positive about her future if she were to be placed with the maternal aunt.

{¶ 32} As previously stated, Father believed that M.M. was malingering and falsely

reporting medical problems. Furthermore, Father testified that M.M. was manipulating all of the adults in her life, including Drs. Harris and Cordell. Despite Dr. Harris and Popp's testimony with respect to M.M.'s threatening suicide if she returned to live with Father, he testified that she would not be in any physical harm if she came to live with him. Father also stated religion was very important to him, and he would insist that M.M. go to church on the weekends. Dr. Cordell testified that forcing religion on M.M. would be detrimental to her mental health. Father is also a trigger for M.M.'s PTSD. Dr. Harris and Dr. Cordell both testified that visitation with Father would therefore have a very negative effect on M.M.'s well-being.

{¶ 33} Finally, the primary reason for MCCS's involvement in the instant case was the mental and physical problems suffered by M.M. The record establishes that M.M. suffered from PTSD, generalized anxiety disorder, major depression, OCD, and Tourette's Syndrome. Dr. Harris testified that M.M. experienced nightmares, intrusive thoughts and memories, flashbacks, difficulty concentrating, suicidal ideation, and anxiety. M.M. also had significant medical issues, including severe headaches, insomnia, and abdominal issues, for which she was being treated by doctors. Both Dr. Harris and Dr. Cordell testified that it would be detrimental to M.M.'s mental health if she were to have any contact with her Father at this juncture.

{¶ 34} Despite all of the evidence to the contrary, Father testified that he believed M.M. was falsely reporting her mental and physical problems. Father also testified that M.M. was manipulating the adults in her life, and that he was the only adult willing to make decisions on her behalf. Popp testified that Father was verbally aggressive with MCCS staff and that every conversation she had with him ended in an argument with him yelling

at her.   Because of the concerns with Father's mental health, MCCS amended his case plan objectives and ordered him to receive a parenting and psychological assessment. Father testified that he suffered from anxiety and had been on medication to treat his condition since 2010.   Furthermore, while their divorce was pending, Father called Mother and threatened to kill himself by driving his truck into a telephone pole.   As a result, Father was taken into custody by the police and placed on psych-hold for seventy-two hours.

**{¶ 35}** In light of the foregoing, we conclude that the trial court did not abuse its discretion when it found that it was in M.M.'s best interests pursuant to R.C. 3109.04(F)(1) to be placed in the temporary custody of the maternal aunt.

**{¶ 36}** Father's second assignment of error is overruled.

**{¶ 37}** Father's third and final assignment of error is as follows:

**{¶ 38}** "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT MADE [FATHER]'S PARENTING TIME CONDITIONAL."

**{¶ 39}** In his third assignment, Father contends that the trial court abused its discretion when it granted him visitation with M.M. only when and if her therapist recommends it.

**{¶ 40}** As previously stated, Dr. Harris testified that triggers for M.M.'s PTSD include Father, talking about Father, and thinking about living with Father.   Dr. Harris testified that she believed that M.M.'s opinions regarding her Father were her own and that she was not malingering or being influenced by her Mother's family against Father. Dr. Harris concluded that visits with Father would be detrimental to M.M.'s progress in treatment, and therefore, not in her best interests.   Echoing the findings made by Dr.

Harris, Dr. Cordell testified that she did not recommend visitation with Father because M.M. was not currently stable enough, and visitation would be detrimental to her treatment.

{¶ 41} Although Father seems genuinely willing to rebuild his relationship with his daughter, we agree with the juvenile court and find that M.M. has clearly and unequivocally maintained that she does not want to have any contact with him and that forcing her to do so would have a negative effect on her. Additionally, the record establishes that M.M. is not malingering nor faking her symptoms. Father's claim that M.M. has manipulated Dr. Harris and Dr. Cordell is simply not supported by the record. Accordingly, we find that the juvenile court did not err when it granted Father visitation with M.M. made contingent upon the recommendation of her therapist.

{¶ 42} Father's third and final assignment of error is overruled.

{¶ 43} All of Father's assignments of error having been overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J. concur.


Copies mailed to:

Alice Peters
Robert Brenner
Michael Booher
Christopher Deal
Theodore Valley
L.B.
Montgomery County Juvenile Court,
c/o Hon. Anthony Capizzi